UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| NICKALAUS VIGUE,<br><br>    Plaintiff<br><br>v.<br><br>SOCIAL SECURITY ADMINISTRATION COMMISSIONER,<br><br>    Defendant | 1:11-cv-00052-NT |

## REPORT AND RECOMMENDED DECISION

The Social Security Administration found that Nikalaus Vigue, a 31-year-old man and father of two, having obesity, carpal tunnel syndrome, and mental impairments, retains the functional capacity to perform substantial gainful activity in light-exertion, simple, low-stress occupations with minimal social demands that exist in significant numbers in the national economy, resulting in a denial of Vigue's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. Vigue commenced this civil action to obtain judicial review of the final administrative decision. Vigue returns to this Court following a prior remand order issued on the Commissioner's voluntary remand motion. I recommend that the Court affirm the administrative decision.

### THE ADMINISTRATIVE FINDINGS

On December 15, 2010, the Decision Review Board issued a final decision on Vigue's claims for benefits. (Docs. Related to Admin. Process, Doc. No. 8-2, R. 4-8.[1]) This decision was rendered in the context of a prior consented-to remand order stating that the DRB would

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 8.

give additional consideration to exhibits 17F, 18F, and 21F in the medical records file.[2] The prior administrative decision is the October 6, 2009, decision of Administrative Law Judge Joseph Shortill. (Doc. No. 8-2, R. 15-25.) In its final decision, the DRB adopted Judge Shorthill's "ultimate conclusion that the claimant was not under a 'disability' because of the ability to perform work existing in significant numbers in the national economy." (R. 4.) It also found that Vigue last met the insured status requirements of Title II on September 30, 2009; that Vigue has not engaged in substantial gainful activity since January 7, 2004; that Vigue's impairments do not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P; that Vigue is not capable of returning to any past relevant work; and that he can transition to other work. (R. 5.)

The issue considered at greater length by the DRB concerned Judge Shortill's residual functional capacity finding and whether it was undermined by the opinions expressed in exhibits 17F, 18F, and 21F (opinions offered by Disability Determination Services consulting, non-examining physicians) or by additional medical records introduced since those opinions were offered. (R. 5.) After considering this evidence, the DRB adopted Judge Shortill's residual functional capacity assessment. That assessment was based on a finding that Vigue has the following severe physical/mental impairments: obesity; carpal tunnel syndrome; affective disorder, bipolar type; post-traumatic stress disorder, antisocial personality disorder, and polysubstance abuse. (R. 18, Finding 3.) The residual functional capacity finding is that these impairments result in a capacity to perform light work, without restrictions on sitting, standing, or walking. This capacity is limited by inability to climb ropes, ladders or scaffolds; to endure extremely cold temperatures; to negotiate hazards; to reach overhead on the right; or to handle or finger more than "frequently." Vigue is "less agile because of his obesity" and "less able to

---

[2]   Case No. 1:10-cv-00055-JAW: Apr. 5, 2010 Order of Remand, Doc. No. 8.

use his hands to save himself due to carpal tunnel syndrome." As for mental capacity, according to the findings, Vigue is able to perform unskilled work that has a specific vocational profile of 1 or 2 and entails only occasional stress, occasional-to-no interaction with the public, and occasional interaction with co-workers. The Judge additionally found that when drug and alcohol abuse are considered, Vigue would miss two or three days of work each month due to substance abuse. (R. 20, Finding 5.) The DRB agreed with these findings after explaining that the opinions offered in exhibits 17F, 18F, and 21F deserved little weight, that "the medical evidence of record shows steady improvement in the claimant's symptoms when he is abstinent from substance abuse," and that without the substance abuse Vigue has the residual functional capacity described by Judge Shortill. (R. 5-6.) The DRB otherwise agreed that the testimony offered by the vocational expert at the hearing demonstrated that there exist a significant number of jobs that Vigue could perform and that Vigue must therefore be found not disabled at step 5. (R. 6.)

The evidentiary basis for the step 5 determination is as follows. Vigue was born in 1980, has a high-school education, and can communicate in English. (R. 24, Findings 6 & 7.) According to the vocational expert, someone with this vocational profile and the residual functional capacity outlined above would be able to transition to occupations existing in substantial numbers, including in the representative occupations of inspector/hand packager and housekeeper/cleaner. (R. 24-25, Finding 9.)

### DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

Vigue argues that the Commissioner erred in regard to the residual functional capacity finding by failing to give controlling weight to the opinion of treating psychiatrist Paul Minot (Ex. 28F), as supported by Minot's treatment notes (Ex. 24F) and related treatment notes from

3

another provider (Ex. 26F). Vigue complains that the DRB made no mention of Dr. Minot's opinion and that Judge Shortill gave it short shrift, while neither offered any appreciable discussion or relied on supportive expert testimony. Vigue reports that the vocational expert's testimony would support a finding that the more significant mental limitations assessed by Dr. Minot would preclude a transition to any substantial gainful activity. He otherwise asserts that the vocational expert's testimony cannot satisfy the Commissioner's step 5 burden because it was premised on a faulty assumption about a claimant's residual functional capacity. (Statement of Errors at 3-8). According to Vigue, none of the expert assessments in support of the Commissioner's RFC finding mentions Dr. Minot's opinion or considers his treatment notes. (Id. at 6-7.) Vigue maintains that the end result is that the Commissioner has assumed the role of a medical expert, something that is not allowed. (Id. at 7, citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 1518 (1996).) A review of the psychiatric assessment records follows.

### A. Psychiatric Assessments of Record

The Maine Disability Determination Services workup begins with a consultative examination report of March 2004 by Mary Alyce Burkhart, Ph.D., when Vigue was in his twenties. (Ex. 4F.) She offered a source statement to the effect that Vigue had significant substance abuse problems in his teens and 20s, consequently lacked appropriate social and interpersonal skills, and had anger-management problems. She diagnosed alcohol dependence, in early remission, depressive disorder NOS, and antisocial personality traits. (R. 370.) As far as her own interaction with Vigue, she considered him to be "interpersonally appropriate." (R. 368.) Thomas Knox, Ph.D., performed the Commissioner's psychiatric review technique in April 2004. He assessed Vigue's level of mental impairment at that time as "non-severe" for

4

social security purposes, predicting only a mild degree of limitation in each of the three categories of mental functioning and finding no evidence of extended episodes of decompensation. Dr. Knox reviewed Dr. Burkhart's report, a January 28, 2004, treatment note (R. 359) and social security claim forms related to adult functioning. (Ex. 5F, R. 371, 381.) This review took place in the context of a prior claim for benefits. (See Ex. 10F, R. 471.)

Based on my review, the record does not contain a good historical narrative of what happened next, but it appears that Vigue's psychiatric health declined between 2004 and 2007. By April 2007, Vigue was leaving a period of incarceration for aggravated assault and was described as homeless and without family support. He presented to the emergency room reporting a desire to hurt himself and others. He spent a week inpatient, received medication therapy, and, according to the discharge summary: "Gradually his mood stabilized within the therapeutic milieu. He was cooperative with care, and he adjusted well to Unit routines." He left this treatment with multiple diagnoses, including schizoaffective disorder, bipolar type, alcohol and cannabis dependence, opiate dependence in sustained remission, nicotine dependence, and personality disorder, NOS, with antisocial traits. His follow-up plan included a referral to Dr. Paul Minot. (Ex. 7F, R. 393-94.) There is a treatment note and a psychiatric review technique form indicating that this referral was complicated by a lack of insurance and failure to qualify for Maine Care. (Ex. 8F, R. 404; Ex. 10F, R. 471.)

Dr. H. Schniewind performed the Commissioner's psychiatric review technique in June 2007, in light of the new evidence. Dr. Schniewind assessed that Vigue's condition was not severe or was not sufficiently demonstrated with medical evidence prior to February 2007. As of that date, however, Dr. Schniewind opined that a residual functional capacity assessment was necessary for affective disorders and substance addiction disorders because the evidence

5

demonstrated moderate difficulties maintaining concentration, persistence, and pace, moderate difficulties maintaining social functioning, and one or two episodes of decompensation. Dr. Schniewind's psychiatric review technique contains the closest thing to a medical history that I have identified in the record. (R. 10F, R. 459, 469, 471.) In his residual functional capacity assessment, Dr. Schniewind anticipated moderate impairment with detailed instruction and attention/concentration over extended periods. He also anticipated moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychological symptoms. Dr. Schniewind's narrative assessment indicates that Vigue responds well to antipsychotic medication and experienced a resurgence of significant symptoms when he became noncompliant with his medication plan in February 2007. Dr. Schniewind predicted that with continued treatment and sobriety Vigue would have the following residual functional capacity by February 2008:

> A) He is able to understand and remember all simple and most complex instructions.
>
> B) He will be able to carry out all simple instructions of up to 4 steps over the Course of a full work day and work week in 2 hour blocks with reasonable rest periods.
>
> C) He will be able to accept supervision as it is usually found in the workplace for simple tasks. He will be able to relate appropriately to coworkers and to the general public. Anxiety will interfere with complex task completion.
>
> D) He will be able to adapt to all routine changes in task assignment and work station and will be able to travel independently.

(R. 475.)

Suggesting Dr. Schniewind may have been correct, a January 2008 outpatient psychiatric treatment note from Paul Minot, M.D., begins with a history statement that Vigue "reports that he is doing well overall on his current medication, with no acute psychiatric complaints," and

6

includes the following assessment: "The patient is stable overall on his current medication regimen, except for complaints of weight gain." (Ex. 12F, R. 477.) Treatment notes in October through December 2007 from Dr. Minot are consistent. (R. 478-80.) The October note, however, reports that Vigue was returning to treatment after four and a half months of incarceration. The history states that Vigue "went off his medications, resumed abusive alcohol, and became assaultive with two companions." (R. 480.) The initial treatment record in this set, a note from June 2007, relates that the primary challenges arise from mood instability and anger outbursts related to childhood abuse coupled with occasional lapsing back into alcohol abuse. (R. 482.)

Maine Disability Determination Services began another round of evaluations in February 2008. Bruce Trembly, M.D., conducted a physical exam and reported a pleasant patient (Ex. 15F, R. 547), but there was no referral for psychiatric examination. In March 2008, Lewis Lester, Ph.D., conducted the psychiatric review technique, and he identified affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders. Like Dr. Schniewind, Dr. Lester assessed moderate limitations with respect to maintaining social functioning and maintaining concentration, persistence, and pace. In his notes, Dr. Lester indicates that he reviewed Dr. Minot's treatment notes through January 2008. (Ex. 17F, R. 582, 592, 594.) In the accompanying residual functional capacity assessment, Dr. Lester assessed marked limitation when it comes to detailed instructions and interaction with the general public, and moderate limitations with respect to: attention/concentration for extended periods, performance of activities within a schedule, maintenance of attendance and punctuality, work with others without distraction, completion of the workday and workweek without interruption from psychological symptoms, acceptance of instruction and response to criticism, engagement

in socially appropriate behavior, and adaptation to changes in the work setting. (Ex. 18F, R. 596-97.) Dr. Lester predicted that, "in spite of mental impairments and associated mental limitations," Vigue would have the following mental residual functional capacity:

> A. Claimant can understand and remember simple, repetitive tasks and procedures. He cares for his son, prepares meals, does domestic chores, shops, handles money, pays bills, uses bank accounts, watches TV and plays video games. His daily activities and mental status exams indicate that he has adequate memory and verbal comprehension for simple tasks. His personality disorder, anxiety and mood instability preclude complex or detailed tasks.
>
> B. He can be reliable and sustain 2-hour blocks at simple tasks at a consistent pace over a normal work day/week. He keeps appointments and carries out a range of sustained daily activities, child care, and household chores.
>
> C. He cannot interact with the public due to his personality disorder, anxiety and mood instability, but he can interact with co-workers and supervisors in a normal work setting. He interacts adequately with care providers and has essentially intact mental status. He shops in the community.
>
> D. He can adapt to occasional and routine changes and does so in his daily life. He can avoid common hazards, travel, and make basic decisions.

(R. 598.)

In September 2008, David Houston, Ph.D., added another mental residual functional capacity assessment to the record. Dr. Houston's assessment mirrors Dr. Lester's, except that his mental residual functional capacity "checkbox" findings assess moderate limitation with regard to public interaction rather than marked. (Ex. 22F, R. 641.) His narrative findings are the same. (R. 642.)

Dr. Minot offered a mental residual functional capacity assessment in May 2009. He identified four areas of mental functioning that he characterized as markedly limited. Three areas fall into the social category: interaction with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers without distracting them or exhibiting behavioral extremes. The fourth area

8

concerns the ability to respond appropriately to changes in the work setting. (Ex. 28F, R. 848.) Dr. Minot described Vigue as "marginally controlled on medications with persistent dysfunction" as indicated in the form's check boxes. (R. 849.)

The Record does not contain a subsequent paper assessment offered by any consulting physician. Nor was there expert medical testimony during the September 2009 hearing.

### B. Discussion

Preliminary to further evaluation of the claimant's alleged disability at steps 4 and 5, the Commissioner must assess the claimant's residual functional capacity. Residual functional capacity amounts to "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The measure of a claimant's residual functional capacity is a function of "all of [the] medically determinable impairments of which [the Commissioner is] aware," including those found not sufficiently severe for purposes of steps 2 and 3. Id. §§ 404.1545(a)(2), 416.945(a)(2). In general, the claimant is responsible for providing the medical evidence needed to make the residual functional capacity finding, though the Commissioner has an obligation to facilitate the development of the record, such as by arranging for consultative examinations, as needed, and referring the medical records for expert review and assessment. Id. §§ 404.1545(a)(3), 416.945(a)(3).

Vigue's core argument is that the Commissioner erred by making a residual functional capacity finding without having an expert specifically address the mental residual functional capacity assessment supplied by Dr. Minot, a treating physician. An administrative law judge is permitted to rely on the RFC assessment of a consulting physician over the competing assessment of a treating physician, provided the consulting physician's assessment is consistent with the objective medical evidence and the administrative law judge provides reasons for

9

rejecting the treating source's assessment. Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the ALJ], not for the doctors or for the courts."); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (reserving "controlling weight" for those treating source opinions that are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record" and articulating factors that govern the amount of weight assigned to treating source opinions); SSR 96-8p (describing evidence considered for purposes of RFC determination); see also Shaw v. Sec'y of Health & Human Servs., 1994 U.S. App. LEXIS 14287 (1st Cir. 1994) (unpublished) ("When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply. All things being equal, however, a treating doctor's report may be entitled to 'greater' weight than an inconsistent non-treating source.")

Following a review of the Record, I conclude that there is substantial evidence in support of the Commissioner's residual functional capacity. The Decision Review Board's decision finds a mental limitation to simple, unskilled work, with only occasional stress. This is consistent with the expert opinion evidence of record. The decision also finds that Vigue's psychiatric conditions impose severe social limitations on work functioning, allowing for only occasional-to-no interaction with the public and only occasional interactions with coworkers. The jobs identified for purposes of step 5 were inspector and hand packager, Dictionary of Occupational Titles code number 559.687-074 and housekeeper/cleaner, number 323.687-014. (R. 25.) The vocational expert identified these jobs in response to a residual functional capacity hypothetical that took into account the Decision Review Board's decision regarding severe social

10

limitations. (R. 65-66.) If the residual functional capacity finding holds up, so will the step 5 finding.

In the Administrative Law Judge's decision, which was adopted by the Decision Review Board, the Judge states that he gave Dr. Minot's assessment of residual functional capacity "careful consideration but little weight," observing that the "evidence shows steady improvement in [Vigue's] symptoms when he is abstinent and takes his medications regularly as prescribed." (R. 23.) In the Judge's view, Vigue's residual functional capacity was more accurately assessed by Dr. Houston, moderated to a degree by Dr. Schniewind. (R. 23.)

"The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). Vigue is arguing that the Judge and the Decision Review Board have strayed into the territory of judging matters entrusted to experts because there is no consulting expert commentary or testimony in the record that post-dates the Minot assessment. I am not persuaded in this case that Dr. Minot's assessment could not be weighed by the finder of fact without the benefit of expert opinion expressly rejecting Dr. Minot's opinion.

It is noteworthy that Dr. Minot's assessment is not totally out of alignment with the weight of the other assessments of record, except that Dr. Minot assigns marked findings for all social functioning. The record, however, does not preclude a lay evaluation that Dr. Minot's assessment does not deserve controlling weight in this regard. To the contrary, the Commissioner's consideration of the Record is such that a reasonable mind might accept it as adequate. That meets the substantial evidence standard. Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1, 3 (1st

11

Cir. 1987). There is a strong indication in the Record that Vigue's antisocial behavior is greatly exacerbated by substance abuse and that he attains a stable mood with abstinence from substances and adherence to his medication therapy. That is, essentially, the social profile reflected in this Record. It is a close question and it would be an easier approach to demand consulting expert assessment whenever a treating source introduces a disabling characterization of a claimant's residual functional capacity when the treating source's opinion is the final opinion evidence of record. However, Vigue has not cited law to the effect that such a rule exists and I am unaware of precedent or a regulation to that effect. In the particular context of this case, the consulting expert assessments, the Judge's review of the longitudinal record, and the Decision Review Board's supplemental review offer a reliable determination despite the fact that all of the consulting expert assessments of record antedate Dr. Minot's somewhat more dire assessment of Vigue's residual functional capacity to function socially in the workplace.

**Conclusion**

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court affirm the Commissioner's final decision and enter judgment in favor of the Commissioner.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 10, 2012